[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10166

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NELKYS TABARES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20036-JEM-1

_____

Before WILSON, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

After pleading guilty, Nelkys Tabares appeals her 24-month sentence for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). On appeal, Tabares argues that the district court erred in (1) denying her request for a minor-role reduction under U.S.S.G. § 3B1.2; and (2) applying the "business of laundering funds" enhancement under U.S.S.G. § 2S1.1(b)(2)(C). After review, we affirm.

## I.    BACKGROUND

### A. Offense Conduct

Beginning in 2011, Mildrey De La Caridad Gonzalez and Milka Yarlin Alfaro organized a conspiracy to defraud Medicare through the submission of false claims from two home health agencies, Golden Home Health Care, Inc. ("Golden") and Homestead Health Care LLC ("Homestead"). Gonzalez and Alfaro recruited Juana Mirta Quintero. In turn, Quintero recruited Tabares, the defendant here, to launder proceeds obtained through the false claims.

In October 2013, the defendant Tabares joined the conspiracy when Quintero started to bring Tabares checks, issued by Golden and Homestead, for Tabares to cash. Tabares cashed the checks, kept ten percent of the money, and returned the remainder to Quintero. Tabares knew that the checks represented the

proceeds from health care fraud that was carried out by her co-conspirators. Tabares believed that cashing the checks allowed her co-conspirators to evade taxes.

After Tabares cashed the first ten checks through her personal bank account, Quintero advised Tabares to open a shell company "to prevent problems with the Internal Revenue Service (IRS)." Quintero told Tabares that the shell company "had to be open less than a year to avoid paying taxes."[1] Tabares met with Quintero's contact, who provided incorporation paperwork for a corporation named Standing 24/7 Inc. (the "shell company"). On April 30, 2014, Tabares filed the incorporation documents, listing herself as the incorporator and registered agent.

With the help of a bank employee who Quintero recommended, Tabares opened a bank account for the shell company. After opening the account, Tabares cashed checks, issued by Golden and Homestead, through the shell company's bank account.

Some of the checks that Tabares cashed were intentionally disguised to represent payments for services rendered. But the shell company never provided "any legitimate services to Golden or Homestead," and it did not pay any state sales and use taxes.

---

[1] Tabares was later served with a tax levy and, through a payment plan, paid $22,027 to the IRS for the total deposits.

The underlying health care fraud scheme lasted from 2011 to 2016, totaling nearly $23 million. Over the course of Tabares's participation from October 2013 to January 2015, Tabares cashed checks totaling $169,462. She kept approximately $16,946 for herself and returned the remainder to Quintero.

After being charged in a multi-count indictment, Tabares pled guilty in May 2020 to one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

### B. Presentence Investigation Report

A presentence investigation report ("PSI") calculated a total offense level of 19, using: (1) a base offense level of 8 under U.S.S.G. § 2S1.1(a)(2) for conspiracy to commit money laundering; (2) a ten-level increase under § 2B1.1(b)(1)(F) because the value of laundered funds was between $150,000 and $250,000; (3) a four-level increase under § 2S1.1(b)(2)(C) because Tabares was "in the business of laundering funds"; and (4) a three-level decrease under § 3E1.1(a)–(b) for acceptance of responsibility. The PSI assigned Tabares a criminal history category of I, yielding an advisory guidelines range of 30 to 37 months.

Tabares objected to the PSI. First, she objected to the Probation Officer's failure to recommend that she receive a two-level minor-role reduction pursuant to § 3B1.2(b). Tabares argued that she "was a miniscule pawn in this elaborate conspiracy" and only acted at the direction of others.

21-10166                Opinion of the Court                5

In response, the Probation Officer explained that the minor-role reduction was not warranted because: (1) Tabares told law enforcement that Quintero gave her the checks to cash so Quintero and other co-conspirators could evade taxes; (2) the shell company was created with the specific intention "to prevent problems with the [IRS]"; (3) the shell company's bank account operated "to disguise the fraud"; and (4) Tabares was "only being held accountable for the loss amount related to her conduct."

Tabares also objected to the application of the four-level increase for being "in the business of laundering funds" under § 2S1.1(b)(2)(C). Tabares claimed that she lost over $5,000 as a result of her participation in the conspiracy due to a tax levy imposed by the IRS, and she was employed as a housekeeper and sales associate over the course of the conspiracy.

In response, the Probation Officer emphasized that Application Note 4 to § 2S1.1 guides courts in applying the "business of laundering funds" increase. Tabares's conduct satisfied three of the relevant factors because she (1) regularly engaged in laundering funds; (2) engaged in laundering funds during an extended period of time; and (3) generated a substantial amount of revenue in return for laundering funds. The Probation Officer did not consider the IRS tax levy to be relevant to the "substantial amount of revenue" analysis.

The government filed a response contending Tabares was not entitled to a minor-role reduction and the court should apply the "in the business of laundering funds" increase. The

government also filed an objection and requested that the district court apply an additional two-level increase for "sophisticated laundering" under § 2S1.1(b)(3).

## C.  Sentencing Hearing

At the sentencing hearing, the district court overruled Tabares's objections and did not grant the government's request for yet another two-level increase for "sophisticated laundering." The district court adopted the PSI's advisory guidelines range of 30 to 37 months of imprisonment, but sentenced Tabares to 24 months of imprisonment. The district court explained that it varied downward "based on the relative guilt of the various" co-conspirators.

## II.      MINOR-ROLE REDUCTION

## A.  Minor-Role Reduction Guideline and Case Law

Section 3B1.2(b) provides that a defendant is entitled to a two-level offense-level decrease if she was a "minor participant in any criminal activity." U.S.S.G. § 3B1.2(b).[2] A defendant is a "minor participant" if she was "less culpable than most other participants in the criminal activity," but her role "could not be described

---

[2] "'We review a district court's denial of a role reduction for clear error.'" *United States v. Cabezas-Montano*, 949 F.3d 567, 605 n.38 (11th Cir. 2020) (quoting *United States v. Valois*, 915 F.3d 717, 730 n.8 (11th Cir. 2019)). "This Court will not disturb a district court's findings regarding the denial of a role reduction unless we are left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks omitted).

as minimal." *Id.* § 3B1.2, cmt. n.5.  In determining whether a defendant is entitled to a minor-role reduction, the district court must consider the totality of the circumstances of the particular case. *Id.* § 3B1.2, cmt. n.3(C).  The defendant bears the burden of establishing, by a preponderance of the evidence, her minor role in the offense. *United States v. Cabezas-Montano*, 949 F.3d 567, 605 n.38 (11th Cir. 2020).

In *United States v. De Varon*, this Court established two principles to guide the determination of whether a defendant played a minor role in the criminal scheme: (1) "the defendant's role in the relevant conduct for which she has been held accountable at sentencing," and (2) "her role as compared to that of other participants in her relevant conduct." *United States v. De Varon*, 175 F.3d 930, 940 (11th Cir. 1999) (en banc).  "In making the ultimate finding as to role in the offense, the district court should look to each of these principles and measure the discernable facts against them." *Id.* at 945.

The commentary to § 3B1.2 provides a non-exhaustive list of factors "[s]imilar to the fact-intensive, multi-faceted approach this Court established in *De Varon*." *United States v. Presendieu*, 880 F.3d 1228, 1249 (11th Cir. 2018).  These factors include: (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority";

(4) "the nature and extent of the defendant's participation in the commission of the criminal activity"; and (5) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2, cmt. n.3(C)(i)–(v).

"The court must consider all of [the § 3B1.2] factors to the extent applicable, and it commits legal error in making a minor role decision based solely on one factor." *United States v. Valois*, 915 F.3d 717, 732 (11th Cir. 2019) (quotation marks omitted).

### B. Analysis of Tabares's Role

Here, based on the totality of the circumstances, the district court did not clearly err in denying Tabares's request for a minor-role reduction. *De Varon*'s first principle asks whether the defendant "played a relatively minor role in the conduct for which she has already been held accountable—not a minor role in any larger criminal conspiracy." *De Varon*, 175 F.3d at 944. The record shows that Tabares understood the scope of the scheme, was important to the scheme, and was held accountable for that conduct alone. *See* U.S.S.G. § 3B1.2, cmt. n.3(C).

When Tabares cashed the checks, some of which were intentionally disguised as representing payments for services rendered, she knew that the proceeds were from a broader scheme to defraud Medicare. *See id.* § 3B1.2, cmt. n.3(C)(i). Further, she believed that the checks helped her co-conspirators evade taxes. Tabares participated in various aspects of the laundering by creating the shell company, Standing 24/7, and an accompanying bank

account to cash the checks.  *See id.* § 3B1.2, cmt. n.3(C)(iv).  Despite knowing that her actions were aiding the health care fraud, Tabares laundered $169,462 over the course of 15 months.  She benefitted from the criminal activity because she kept ten percent of every cashed check, generating $16,946 for herself.  *See id.* § 3B1.2, cmt. n.3(C)(v).

Second, Tabares's role in the laundering was not minor when compared to other participants in the conduct for which she was held accountable.  Tabares principally argues that she was less culpable than Quintero or the organizers of the Medicare fraud conspiracy.  However, the relevant inquiry is whether Tabares played a minor role in laundering the $169,462 for which she was held accountable.  *See De Varon*, 175 F.3d at 940.  While Quintero gave Tabares direction, the record makes clear that Tabares's actions were important to the laundering.  Tabares filed the incorporation documents for the shell company, set up the bank account, and cashed the checks.  Thus, even though Quintero also participated in laundering the $169,462, it does not follow that Tabares played a minor role.  *See United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) ("Even if a defendant played a lesser role than the other participants, that fact does not entitle her to a role reduction since it is possible that none are minor or minimal participants." (quotation marks omitted)).

Based on the totality of the circumstances, the district court did not clearly err in denying Tabares a minor-role reduction.

### III.    LAUNDERING OF FUNDS

### A.  Text and Application Note to § 2S1.1(b)(2)(C) Guideline

The sentencing guidelines for a violation of 18 U.S.C. § 1956(h) are found in U.S.S.G. § 2S1.1, titled: "Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity."  Section 2S1.1(a) contains two separate provisions to calculate a defendant's base offense level. Section 2S1.1(a)(1) applies if (1) "the defendant committed the underlying offense," or would be held accountable for it as relevant conduct; and (2) "the offense level for that offense can be determined."  Here, Tabares did not commit the underlying offense of health care fraud and was not held accountable for it as relevant conduct.

Rather, the second and applicable provision is § 2S1.1(a)(2). Section 2S1.1(a)(2) calculates a defendant's total base offense level by assigning a base offense level of 8 and then adding the number of offense levels "corresponding to the value of the laundered funds" from the table in § 2B1.1.  As explained earlier, Tabares's base offense level of 8 was increased ten levels under the table in § 2B1.1(b)(1)(F) because of the value of her laundered funds.

After calculating that base offense level under § 2S1.1(a), courts turn to "Specific Offense Characteristics" under § 2S1.1(b).[3]

---

[3] Section 2S1.1(b)(1) applies a six-level increase if (1) "subsection (a)(2) applies"; and (2) "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the

Section 2S1.1(b)(2) contains three different offense-level increases, and courts are instructed to apply the greatest of those three. The three potential increases are: (1) a one-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1957"; (2) a two-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1956"; and (3) a four-level increase, "[i]f (i) subsection (a)(2) applies; and (ii) the defendant was in the business of laundering funds." U.S.S.G. § 2S1.1(b)(2)(A)–(C). Tabares was convicted under 18 U.S.C. § 1956(h), and the two-level increase would apply but for the command to apply the greatest of the three offense-level increases. *See id.* § 2S1.1(b)(2). In Tabares's case, as outlined above, the district court applied the four-level increase because § 2S1.1(a)(2) applies, and Tabares was "in the business of laundering funds." *See id.* § 2S1.1(b)(2)(C). On appeal, Tabares challenges the district court's determination that she was in the business of laundering funds.

To determine whether a defendant "was in the business of laundering funds," courts are instructed by Application Note 4 to § 2S1.1(b)(2)(C) to examine the totality of the circumstances. U.S.S.G. § 2S1.1 cmt. n.4(A).[4] The commentary also contains a

---

manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of violence; (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor." Section 2S1.1(b)(1) is inapplicable to Tabares because the laundered funds were not proceeds from, nor intended to promote, any of the requisite categories.

[4] "We review the interpretation and application of the Sentencing Guidelines *de novo*, and we review underlying findings of fact for clear error." *United*

non-exhaustive list of factors "that may indicate the defendant was in the business of laundering funds for purposes of subsection (b)(2)(C)." *Id.* § 2S1.1 cmt. n.4(B). The commentary lists the following: whether the defendant (1) regularly engaged in laundering funds; (2) laundered funds for an extended period of time; (3) engaged in laundering funds from multiple sources; (4) generated a substantial amount of revenue in return for laundering funds; (5) had a prior conviction for certain money laundering related offenses; and (6) made statements during the course of an undercover government investigation that the defendant had engaged in any of the conduct listed in factors (1), (2), (3), or (4). *Id.* § 2S1.1 cmt. n.4(B)(i)–(vi).

## B.  Four Factors Apply to Tabares

The first factor examines whether Tabares "regularly engaged in laundering funds." We have defined regularly as "more than isolated, casual, or sporadic activity." *See United States v. Saunders*, 318 F.3d 1257, 1265 (11th Cir. 2003) (applying the enhancement for being "in the business of receiving and selling stolen property" under § 2B6.1(b)(2)) (quotation marks omitted). Here, Tabares's conduct was not isolated, casual, or sporadic. Tabares cashed approximately two dozen checks, through both her

---

*States v. Jackson*, 997 F.3d 1138, 1140 (11th Cir. 2021). The government bears the burden of proving, by a preponderance of the evidence, the applicability of guidelines that enhance a defendant's offense level. *United States v. Plasencia*, 886 F.3d 1336, 1346 (11th Cir. 2018).

personal bank account and the shell company's bank account. *See* U.S.S.G. § 2S1.1 cmt. n.4(B)(i).  The first factor supports the four-level increase.

The second, third, and fourth factors are also satisfied.  As to the second factor, Tabares laundered funds for an extended period of time—15 months—from October 2013 to January 2015.  *See* § 2S1.1 cmt. n.4(B)(ii); *see also United States v. Mitchell*, 613 F.3d 862, 869 (8th Cir. 2010) (finding that 16 to 18 months was long enough to be considered an "extended period of time").  As to the third factor, although Tabares argues that the checks came only from Quintero and one health care fraud scheme, the checks were actually issued by and belonged to multiple companies (Golden and Homestead).    Therefore, the funds came from multiple sources. *See* U.S.S.G. § 2S1.1 cmt. n.4(B)(iii).  As to the fourth factor, Tabares generated a substantial amount of revenue through laundering, almost $17,000.  *Id.* § 2S1.1 cmt. n.4(B)(iv).

We recognize that the fifth and sixth factors do not apply to Tabares.  As to the fifth factor, Tabares has no criminal history, let alone a prior conviction involving money laundering or conspiracy to commit money laundering. *See id.* § 2S1.1 cmt. n.4(B)(v).  As to the sixth factor, Tabares did not make any statements about her conduct during an undercover government investigation. *See id.* § 2S1.1 cmt. n.4(B)(vi).

Nonetheless, four factors weigh in favor of the increase and based on the totality of the circumstances in this particular case, we cannot say the district court erred in finding that Tabares was "in

the business of laundering funds," such that the four-level increase applied. *See id.* § 2S1.1 cmt. n.4(B)(i)–(vi).

## IV.    CONCLUSION

For all of these reasons, we affirm Tabares's 24-month sentence.

**AFFIRMED.**